FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 08, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

TRE J.,[1]

               Plaintiff,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

               Defendant.

No.    4:21-cv-5014-EFS

**ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION, AND REMANDING FOR ADDITIONAL PROCEEDINGS**

Plaintiff Tre J. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ did not explain why Plaintiff was not limited to 1-to-2-step instructions, and because the ALJ did not reconcile the apparent conflict between such a limitation and the requirements of the jobs that he found Plaintiff could perform, the ALJ erred. The Court therefore reverses the decision of the ALJ and remands this matter for further proceedings.

---

[1] For privacy reasons, the Court refers to Plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

1

## I.    Five-Step Disability Determination

2      A five-step sequential evaluation process is used to determine whether an

3  adult claimant is disabled.[2]  Step one assesses whether the claimant is engaged in

4  substantial gainful activity.[3]  If the claimant is engaged in substantial gainful

5  activity, benefits are denied.[4]  If not, the disability evaluation proceeds to step

6  two.[5]

7      Step two assesses whether the claimant has a medically severe impairment

8  or combination of impairments that significantly limit the claimant's physical or

9  mental ability to do basic work activities.[6]  If the claimant does not, benefits are

10  denied.[7]  If the claimant does, the disability evaluation proceeds to step three.[8]

11      Step three compares the claimant's impairment or combination of

12  impairments to several recognized by the Commissioner as so severe as to preclude

13  substantial gainful activity.[9]  If an impairment or combination of impairments

14

_____

15  [2] 20 C.F.R. §§ 404.1520(a), 416.920(a).

16  [3] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

17  [4] *Id.* §§ 404.1520(b), 416.920(b).

18  [5] *Id.* §§ 404.1520(b), 416.920(b).

19  [6] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

20  [7] *Id.* §§ 404.1520(c), 416.920(c).

21  [8] *Id.* §§ 404.1520(c), 416.920(c).

22  [9] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[10]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[11]  If the claimant can perform past work, benefits are denied.[12]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[13] If so, benefits are denied. If not, benefits are granted.[14]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[15] At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[16]

---

[10] 20 C.F.R. §§ 404.1520(d), 416.920(d).

[11] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[14] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[15] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[16] *Id.*

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

1

## II.    Factual and Procedural Summary

2

Plaintiff filed a Title 16 application, initially alleging disability beginning

3    April 23, 2015, and later amending the alleged onset date to September 3, 2018.[17]

4    His claim was denied initially and on reconsideration.  Upon request, ALJ Stewart

5    Stallings held an administrative hearing via telephone and took testimony from

6    Plaintiff about his conditions and symptoms.[18]  An impartial vocational expert also

7    testified at the hearing.[19]  After the hearing, the ALJ issued a decision denying

8    Plaintiff's disability application and finding as follows:

9    • Step one: Plaintiff had not engaged in substantial gainful activity since

10       September 3, 2018, the application date and alleged onset date.

11   • Step two: Plaintiff had the following medically determinable severe

12       impairments:

13       o  seizure disorder;
         o  right knee meniscal tear, status post-surgery;
14       o  right shoulder instability, status post-surgery;
         o  depressive disorder;
15       o  anxiety disorder;
         o  attention-deficit disorder; and
16       o  impulse-control disorder.

17

18

19

_____

20

[17] AR 40–41, 167–82.

21

[18] AR 15, 36–70.

22

[19] AR 15, 36–70.

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform light work, subject to the following additional limitations:

  > the claimant can lift and carry up to twenty pounds occasionally and ten pounds frequently. He can stand and walk for six hours and sit for six hours out of an eight-hour workday with normal breaks. He cannot climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, crouch, kneel, and crawl. He should avoid all exposure to moving, dangerous machinery, unprotected heights, or driving a motor vehicle at work. He is limited to simple, routine, repetitive tasks; low-stress work, meaning no production pace or conveyor belt type work; predictable work environment; can tolerate occasional simple, workplace changes; and work that requires no more than brief, superficial interaction with the public, co-workers and supervisors, although during any training periods there may be more frequent interactions.[20]

- Medical opinions:

  o The opinions of Norman Staley, M.D., and Howard Platter, M.D., reviewing state-agency consultants, were "generally persuasive, as they are supported by explanations and somewhat consistent with the overall evidence."[21]

---

[20] AR 20.

[21] AR 23.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

○ The opinions of Christmas Covell, Ph.D., and Kent Reade, Ph.D.,
reviewing state-agency consultants, were "generally persuasive, as
they are supported by explanations and generally consistent with the
overall evidence"—except that "the evidence does not support the
finding of a severe neurocognitive impairment."[22]

○ The opinion of examining psychologist Philip G. Barnard, Ph.D., was
not persuasive, as another expert had questioned the validity of
testing used and "the opined limitations are inconsistent with the
overall evidence."[23]

○ The opinion of Brian VanFossen, Ph.D., was "more persuasive than
the opinion [of Dr. Barnard]," as Dr. VanFossen provided a detailed
explanation and the opinion is "generally consistent with the overall
evidence," but "it is not fully persuasive as it does not take into
account any social limitations."[24]

○ The opinions of treating physicians Doyle J. Miller, and Thomas
Westhusing, D.O., were partially persuasive, as "the opined
limitations are partially consistent with the overall evidence."[25]

---

[22] AR 24.

[23] AR 24.

[24] AR 24–25.

[25] AR 25.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as router, collator operator, and routing clerk.[26]

The ALJ issued a written decision finding Plaintiff had not been under a disability, as defined by the Social Security Act (the "Act"), from September 3, 2018, through the date of the ALJ's decision, October 16, 2020.[27]  The Appeals denied review.  Plaintiff then appealed to this Court, primarily asserting that the ALJ erred by improperly evaluating certain medical evidence and opinions, rejecting severe impairments as groundless at step two, failing to find Plaintiff disabled at step three, and rejecting Plaintiff's symptom reports.[28]

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[29] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[30]  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable

---

[26] AR 27.

[27] AR 27.

[28] *See generally*, ECF Nos. 17, 21.

[29] 42 U.S.C. § 405(g).

[30] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

mind might accept as adequate to support a conclusion."[31]  Because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[32]  The Court considers the entire record as a whole.[33]

Further, the Court may not reverse an ALJ decision due to a harmless error.[34]  An error is harmless "where it is inconsequential to the ultimate nondisability determination."[35]  The party appealing the ALJ's decision generally bears the burden of establishing harm.[36]

## IV.    Analysis

Plaintiff asserts that the ALJ erred by (1) "failing to translate the limitation to 1–2 step tasks opined by Dr. Reade to the RFC," (2) "rejecting the well-supported

---

[31] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[32] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[33] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up).

[34] *Molina*, 674 F.3d at 1111.

[35] *Id.* at 1115 (cleaned up).

[36] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

1

2

disabling opinions of Dr. Barnard and Dr. Westhusing," and (3) "failing to provide

clear and convincing reasons for making a negative credibility finding."[37]

3        **A.      Medical Opinions: Plaintiff establishes consequential error.**

4                Although an ALJ need not assign any specific evidentiary weight to the

5        medical opinions of record, the ALJ must nonetheless consider and evaluate the

6        persuasiveness of all medical opinions and prior administrative medical findings.[38]

7        The factors for evaluating the persuasiveness of medical opinions include, but are

8        not limited to, supportability, consistency, relationship with the claimant, and

9        specialization.[39]  Typically, the ALJ is not required to expressly address each

10       medical source's specialization or relationship with the claimant.[40]  As

11

12

13       _____

      [37] ECF No. 17 at 9, 19.

14

15       [38] Because Plaintiff's claims were filed on or after March 27, 2017, the newer

16       regulations governing the ALJ's evaluation of medical opinions apply to this case.

17       *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL

18       168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. *See*

19       *also* 20 C.F.R. §§ 404.1513(a), 416.913(a) (defining "medical opinion").

20       [39] 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

21       [40] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or

22       prior administrative findings "about the same issue are both equally well-

23       supported . . . and consistent with the record . . . but are not exactly the same," the

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

1
2

supportability and consistency are the most important factors, however, the ALJ is required to explain how both such factors were considered.[41]

3

### 1. Dr. Reade's Medical Opinions: Plaintiff shows consequential error.

4
5
6
7
8

Plaintiff first challenges the ALJ's treatment of the medical opinions expressed by reviewing state-agency consultant Kent Reade, Ph.D.[42]  According to Plaintiff, "[d]espite claiming to adopt [Dr. Reade's] findings," the ALJ's RFC assessment failed to properly account for an opinion limiting Plaintiff to 1-to-2-step tasks.[43]  For the reasons that follow, the Court agrees.

9

### a. *Dr. Reade's Opinions*

10
11
12
13
14
15

In June 2019, Dr. Reade assessed Plaintiff's mental RFC.  As relevant here, when called upon to "[e]xplain in narrative form the presence and degree of specific understanding and memory capacities and/or limitations," Dr. Reade opined that Plaintiff retains the capacity to "understand and remember simple 1–3 step instructions" but "would not be able to consistently understand and remember instructions that are more detailed than this."[44]  Yet, in explaining Plaintiff's

16

_____

17
18
19

ALJ is required to explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

[41] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

20
21

[42] ECF No. 17 at 9–10.

[43] ECF No. 17 at 10.

22

[44] AR 97.

23

"sustained concentration and persistence capacities and/or limitations," Dr. Reade wrote that Plaintiff retains the capacity to "carry out simple 1–2 step instructions" but "would not be able to carry out tasks that are more detailed than this on a consistent and regular basis."[45]  Dr. Reade did not explain why Plaintiff would be unable to "carry out" the last step of a 3-step task despite being able to "understand and remember" all three steps.

     *b.*  <u>*The ALJ's Persuasiveness Findings and RFC Assessment*</u>

   As relevant here, the ALJ found "generally persuasive" Dr. Reade's opinions that Plaintiff "retained the capacity to understand and remember simple one-to-three step instructions; carryout and maintain concentration, persistence, and pace for up to two hours; complete a normal workweek; could interact with others on a superficial and occasional basis; and would be able to adapt to normal, routine changes."[46]  The ALJ did not address Dr. Reade's opinion limiting Plaintiff to "simple 1–2 step instructions."  Rather, without articulating whether such tasks could include instructions with one, two, or some other number of steps, the ALJ went on to find Plaintiff limited to "simple, routine, repetitive tasks."[47]

---

[45] AR 97.

[46] AR 24 (citing AR 96–97).

[47] AR 20; *see also* AR 23 ("Given the claimant's concentration and memory difficulties, the evidence supports that the claimant is limited to simple, routine, repetitive tasks.").

1

2          *c.*      <u>*The Vocational Expert's Testimony*</u>

3          Presented with the limitation to simple and repetitive tasks, the vocational

4   expert testified that work existed in the national economy which Plaintiff could

5   perform, including the jobs of router, collator operator, and routing clerk.[48]  The

6   vocational expert explained that, due to the simple-task limitation, he had

7   excluded positions for which the Dictionary of Occupational Titles (DOT) indicates

8   a reasoning ability of Level 3 or higher is required.[49]  When asked by the ALJ, the

9   vocational expert further explained that simple, repetitive work included only

10

11

12

13   _____

14   [48] AR 61–62.

15   [49] The DOT is a "primary source of reliable job information" for the Commissioner.

16   *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990); *see also* 20 C.F.R.

17   § 404.1566(d)(1) (2017).  "The DOT describes the requirements for each listed

18   occupation, including the necessary General Educational Development ('GED')

19   levels. . . .''; the GED levels, in turn, specify the associated level of reasoning

20   development, "ranging from Level 1 (which requires the least reasoning ability) to

21   Level 6 (which requires the most)." *Zavalin*, 778 F.3d at 846 (citing DOT, App'x C,

22   1991 WL 688702 (4th ed. 1991)).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 12

those jobs with reasoning at Level 1 or 2.[50]  And, according to the DOT, each of the three jobs identified by the vocational expert require reasoning Level 2.[51]

Plaintiff argues that—at Level 2—all the identified jobs require too high of a reasoning level.  Per Plaintiff, if Dr. Reade's opined 1-to-2-step-task limitation is incorporated into the RFC, he is limited to work that involves reasoning no higher than Level 1.[52]

### d.    *RFC Analysis and Reasoning Levels*

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."[53]  When incorporating a credited medical opinion, the ALJ's findings need only be consistent with the opined limitations, not identical to them.[54]  However, while the ALJ is not bound to adopt such a medical opinion verbatim, the ALJ is nevertheless required to explain why any conflicting opinions were not adopted; it is error for an ALJ to simultaneously claim to incorporate a

---

[50] AR 63–64.

[51] *See* DOT 222.587-038, 1991 WL 672123 (router); DOT 208.685-010, 1991 WL 671753 (collator operator); DOT 222.687-022, 1991 WL 672133 (routing clerk).

[52] ECF No. 17 at 10.

[53] *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).

[54] *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1271, 1223 (9th Cir. 2010).

1    medical opinion and yet, without explanation, omit relevant limitations set forth in

2    that medical opinion.[55]

3          On the one hand, a limitation to work involving only "simple, routine,

4    repetitive tasks" is consistent with the ability to perform jobs requiring Level 2

5    reasoning.[56]  On the other hand, Dr. Reade did not just limit Plaintiff to "simple,

6    routine, repetitive tasks"; he limited Plaintiff to tasks involving no more than one

7    or two steps.  This is a meaningful difference.  In the Ninth Circuit, a limitation to

8    1-to-2-step tasks is more restrictive than a limitation to "simple" or "repetitive"

9    tasks.[57]

10              e.    *Consequential Error*

11         Because the ALJ found Dr. Reade's opinions to be "generally persuasive," the

12   ALJ was required to either include the 1-to-2-step limitation or to explain why it

13   

14   ───────────────

15   [55] *See* SSR 96-8p, 1996 WL 374184 at *7 (Jul. 2, 1996); *Robbins v. Soc. Sec. Admin.*,

16   466 F.3d 880, 883 (9th Cir. 2006) (requiring the ALJ to account for all relevant

17   evidence in assessing the RFC).

18   [56] *See, e.g.*, *Abrew v. Astrue*, 303 Fed. App'x. 567, 569–70 (9th Cir. 2008)

19   (unpublished) (finding a limitation to simple tasks consistent with jobs requiring

20   Level 2 reasoning); *Lara v. Astrue*, 305 Fed. App'x. 324, 326 (9th Cir. 2008)

21   (unpublished) (same).

22   [57] *See Rounds*, 807 F.3d at 1002–03 (concluding that jobs requiring Level 2

23   reasoning are inconsistent with a limitation to 1- or 2-step instructions).

was omitted from the RFC.[58]  The ALJ erred by not doing so.  Even assuming that other evidence of record could be reasonably interpreted to support exclusion of that limitation, the Court is constrained to review only the reasoning provided by the ALJ.[59]  Here, the Court simply cannot discern whether the ALJ, in crafting Plaintiff's RFC, intended to incorporate or reject Dr. Reade's assigned 1-to-2-step-task limitation.

Further, the Court cannot find it harmless.[60]  As mentioned, every occupation identified by the vocational expert and accepted by the ALJ requires Level 2 reasoning.  And the ALJ did not inquire with the vocational expert about whether any of the three identified occupations could still be performed if further limited to only 1-to-2-step tasks.[61]

    2.    <u>Dr. Barnard's Medical Opinions: Plaintiff does not establish consequential error.</u>

Plaintiff takes issue with the ALJ's persuasiveness analysis regarding the medical opinions of examining psychologist Philip G. Barnard, Ph.D.  "Dr. Barnard administered comprehensive testing establishing borderline to extremely low

---

[58] *See* SSR 96-8p; *Robbins*, 466 F.3d at 883.

[59] *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006).

[60] *Molina*, 674 F.3d at 1115.

[61] *See Rounds*, 807 F.3d at 1002–03; *see also* SSR 00-4p, 2000 WL 1898704; *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).

1  memory scores, with additional deficits in orientation, concentration, abstract

2  thought, insight, and judgment[.]"[62]  Thus, Plaintiff says, the ALJ erred by

3  rejecting Dr. Barnard's disabling assessment.[63]

4            a.     <u>*Dr. Barnard's Report*</u>

5          In mid-September 2018, Philip G. Barnard, Ph.D., a board-certified

6  psychologist, examined Plaintiff and authored a psychological/psychiatric-

7  evaluation report based on his findings.[64]  Dr. Barnard was not provided with any

8  prior records to review, but he administered several tests.  On the Wechsler

9  Memory Scale-IV (WMS), Plaintiff tested mostly in the "Extremely Low" range,

10  with him scoring at or below the bottom 1% in four of the five indices.[65]  However,

11  on the Wechsler Adult Intelligence Scale (WAIS-IV), Plaintiff tested in the "Low

12  Average" and "Average" ranges, with those indices ranging in percentile rank from

13  10% to 30%.[66]

14          Dr. Barnard also administered a Personality Assessment Inventory (PAI).

15  In the notes on Plaintiff's mood, Dr. Barnard wrote, "On PAI, there are subtle

16  indications that [Plaintiff] attempted to portray himself in a somewhat negative

---

18  [62] ECF No. 17 at 16.

19  [63] ECF No. 17 at 10–14.

20  [64] AR 407–11.

21  [65] *See* AR 410.

22  [66] *See* AR 411.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 16

manner.  However, this is not to a degree that would invalidate the protocol."[67]  As to the Test of Memory Malingering (TOMM), Dr. Barnard stated that Plaintiff "obtained a Raw Score of 46 on Trial 1 and a Raw Score of 50 on Trial 2, within normal limits."[68]

In addition to Attention Deficit Hyperactivity Disorder (ADHD), Persistent Depressive Disorder, and Bipolar Disorder, Dr. Barnard diagnosed Plaintiff with "Mild Neurocognitive Impairment (Due to Seizures)."[69]  Dr. Barnard opined that Plaintiff's memory and concentration were not within normal limits, saying that his "problems with attention and concentration would affect his ability to work on a daily basis to a moderate extent."[70]  On the checklist for "Basic Work Activity," Dr. Barnard opined that Plaintiff's psychological symptoms cause marked limitations in his ability to perform within a schedule, maintain regular

---

[67] AR 410.  *See also* McCredie et al., *Personality Assessment Inventory (PAI) for assessing disordered thought and perception*, American Psychological Association (2021) https://doi.org/10.1037/0000245-006 ("The Personality Assessment Inventory (PAI) is a multiscale, self-administered questionnaire designed to provide a comprehensive assessment of client personality and psychopathology.").

[68] AR 411.

[69] AR 409.

[70] AR 411.

1    attendance, complete a normal workday and workweek, act appropriately in a work

2    setting, and communicate and perform effectively in a work setting.[71]

3            b.    _Dr. VanFossen's Review of Dr. Barnard's Report_

4            In late September 2018, a state agency referred Dr. Barnard's report to

5    consulting psychologist Brian VanFossen, Ph.D., to assess Dr. Barnard's findings.[72]

6    Upon review, Dr. VanFossen rejected the medical opinions expressed in

7    Dr. Barnard's report.  In finding that Dr. Barnard's diagnoses and opinions

8    regarding severity and functional limitations were not supported by the medical

9    evidence, Dr. VanFossen provided—in its entirety—the following rationale:

> Ongoing neurological concerns were reported, in the context of a past
> resolved diagnosis of ADHD and depression.   The applicant reported
> knee problems as the primary barrier to employment.  PAI testing
> was completed, but the scores not reported; over-reporting was noted.
> WAIS testing was within the low average range.  WMS testing does
> not appear valid, with scores that are very atypical for even dementia
> patients (<0.lst percentile), despite the wealth of information obtained
> from the claimant and working memory in the average range on the
> WAIS.
> The diagnoses were not supported by the DSM criteria and there was
> no mention of functional impairment.[73]
> There is no mention of functional impairment due to a mental health
> diagnosis that would prohibit work tasks.  The claimant appears
> capable of simple labor tasks from a strictly mental health standpoint.
> The ratings are best reflected in the mild range across the table.[74]

---

[71] AR 409.

[72] AR 697–98.

[73] AR 697.

[74] AR 697 (internal checkmark prompt omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

c.    *Arguments and Analysis*

Here, the ALJ did not err in finding Dr. Barnard's opinions not persuasive. Substantial evidence supports the ALJ's finding that Plaintiff's extremely low memory scores on the WMS appeared inconsistent with the results from several other tests also administered by Dr. Barnard.[75]  Further, "[w]hile supported by an exam, the validity of that testing was questioned."[76]  As the ALJ pointed out, Dr. VanFossen opined that the "WMS testing does not appear valid," explaining that Plaintiff's scores are "very atypical for even dementia patients," and they are inconsistent with both Plaintiff's average working-memory test results and "the wealth of information" Dr. Barnard obtained from him.[77]

Importantly, Dr. Barnard offered no explanation as to how Plaintiff can generally function at what is seemingly a level far greater than would be indicated by his WMS scores, or why Plaintiff scored so much higher on other memory tests administered that same day.  Contrary to Plaintiff's arguments otherwise, Dr. VanFossen and the ALJ did not engage in "unsupported speculation" by

---

[75] AR 24 ("Testing revealed a full-scale IQ score of 86, which was in the low-average range.  He was able to recall three of three objects after a delay. . . . He was also able to repeat digits forwards and backwards." (internal citations omitted.)).

[76] AR 24.

[77] *See* AR 697 (Dr. VanFossen's reviewing report); AR 24 (ALJ citing Dr. VanFossen's report).

citing—with specificity—what appear to be significant unresolved inconsistencies in the evidence underlying Dr. Barnard's opinions.[78]  Rather, by doing so, they provided legitimate reasons to doubt the reliability of Plaintiff's WMS test results. Thus, it was reasonable for the ALJ to find Dr. Barnard's opinions were not well supported.

Because they necessarily hinge on the validity of the ALJ's persuasiveness findings, the Court need not separately address Plaintiff's arguments that the ALJ erred at other steps of the sequential analysis by "failing to account for [Plaintiff]'s neurocognitive impairment and objective testing scores."[79]  Aside from the asserted

---

[78] See ECF No. 17 at 17.  Notably, Dr. VanFossen's observation that Dr. Barnard had noted "over-reporting" appears largely—if not wholly—unrelated to the reasons provided for rejecting Plaintiff's WMS results.  It is in a separate paragraph dedicated to discussing the memory-test scores in which Dr. VanFossen questions the validity of the WMS testing and provides his related reasoning. See AR 697.  Moreover, the ALJ's decision in no way suggests he questioned the WMS results based on suspicions of overreporting or malingering.  As such, to the extent Plaintiff suggests that his PAI and TOMM scores undercut the ALJ's persuasiveness analysis, such arguments are misplaced. See ECF No. 17 at 12.

[79] See ECF No. 17 at 9.

1    1-to-2-step-task additional limitation already discussed, Plaintiff does not identify

2    any other memory-related limitations not included in the RFC.[80]

3        3.    Dr. Westhusing's Medical Opinions: Plaintiff does not establish

4             consequential error.

5        In June 2020, treating physician Thomas Westhusing, D.O., filled out a

6    medical-opinion form provided to him by Plaintiff's counsel.[81]  In it, Dr.

7    Westhusing opined that Plaintiff would miss, on average, one workday per month

8    due to his impairments.  Dr. Westhusing explained this was because Plaintiff's

9    seizures occur at that same frequency and because Plaintiff "has difficulty with

10   focus and social interactions."[82]  Dr. Westhusing also indicated that the cumulative

11   effect of Plaintiff's limitations would likely cause him to be off-task and

12   unproductive for more than 30% of a 40-hour workweek.[83]

13       a.    *The ALJ's Persuasiveness Analysis*

14       In rejecting these opinions, the ALJ provided the following analysis:

15   While supported by an explanation, Dr. Westhusing noted that the
     opinion was not based on objective evidence, but was based on
16   subjective comments from the claimant and his grandma (8F).
     Further, the opined limitations are partially consistent with the
17   overall evidence.  Here, treatment notes detail the initial seizure in
     April 2016 and one breakthrough seizure [in] November 2018.  Of
18

19   ────────────────────
     [80] *See Molina*, 674 F.3d at 1115.
20
     [81] AR 776–78.
21
     [82] AR 77.
22
     [83] AR 777.
23

note, the provider noted that there was medication noncompliance at that time. At additional exams, no seizures were reported with consistent medication compliance. . . .  [T]he time[-off-]task limitations are no[t] supported by the objective exam findings and overall evidence.[84]

### b.  *Arguments and Analysis*

In challenging the ALJ's analysis, Plaintiff asserts that the ALJ's first statement is "unequivocally false" because "Dr. Westhusing neither mentioned the claimant's grandmother nor his own subjective complaints anywhere in Exhibit 8F."[85]  However, while *Exhibit 8F* does not contain such a statement,[86] Dr. Westhusing did include this reservation—and others—in his corresponding treatment note, explaining,

> No physical exam was performed and responses were predominantly subjective based on patient and grandmother's reports[.]  [I]f further details concerning his mental health issues are desired I would question directly both Dr. Pe and[,] concerning his seizure disorder, Dr. Raghunath.
>        . . . .
> The form will be completed in a subjective way as I do not have any objective assessment available to determine objective responses to the questions provided.  Patient is seeing Dr. Pe . . . for history of ADHD as well as bipolar. . . .  Patient also sees neurology, Dr. Raghunath, for complex partial seizures that then can evolve into generalized seizure. . . .  Grandmother reports he typically will have a seizure about once a month.[87]

---

[84] AR 25 (cleaned up, with one internal citation intentionally included).

[85] ECF No. 17 at 15.

[86] *See* ECF No. 776–78.

[87] AR 852–53.

Especially given the above, the ALJ did not err in finding unpersuasive Dr. Westhusing's opinions regarding Plaintiff's likely rate of absenteeism and time off task.  An ALJ may properly discount a treating provider's opinion that is based on subjective self-reports which the ALJ reasonably found not credible.[88]  And Dr. Westhusing not only cautioned that his opinions were based on subjective self-reports, he also suggested that other doctors were better suited to addressing the impairments and symptoms at issue.  It was therefore reasonable for the ALJ to find Dr. Westhusing's opinions were not supported by reliable evidence.

**B.    Symptom Reports: the ALJ is instructed on remand to reexamine Plaintiff's reports relating to seizure and mental-health symptoms.**

Plaintiff does not articulate what specific testimony he believes the ALJ improperly rejected or how such testimony would alter the ultimate outcome if adopted.[89]  However, in challenging the ALJ's overall decision, Plaintiff asserts that the RFC should have included additional limitations related to absenteeism,

---

[88] *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014).

[89] The Court ordinarily will not consider matters that are not "specifically and distinctly argued" in a party's opening brief. *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008); *see also Molina*, 674 F.3d at 1115; *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) (a party's argument must be supported by "the reasons for them, with citations to the authorities and parts of the record").

off-task time, and his need to frequently lie down.[90]  And Plaintiff's testimony

regarding his seizure and mental-health symptoms arguably support such

additional limitations.[91]  Further, as explained above, this matter is already

subject to remand.  Thus, to provide further guidance on remand, the Court

addresses the ALJ's evaluation of Plaintiff's seizure-related symptom reports.[92]

      1.    <u>Plaintiff's Seizure-Related Symptom Reports</u>

      Plaintiff reported substantial limitations related to seizures.  At the late-

July 2020 hearing, Plaintiff testified to suffering from seven grand mal seizures in

that year alone, with his last grand mal seizure occurring in mid-June 2020.[93]  He

estimated he averages one grand mal seizure per month.  However, these seizures

---

[90] ECF No. 17 at 21.

[91] In contrast, nothing in Plaintiff's testimony can be reasonably interpreted as supporting the final additional limitation he asserts.  Plaintiff testified very briefly to sometimes getting angry and yelling at his family, but he did not describe anything approximating "ongoing disrespectful/defiant behavior" or otherwise give any suggestion that such behavior would extend to the workplace. *See* AR 55–56. *Cf. also, e.g.*, AR 42–46, 91.

[92] *See* ECF No. 17 at 21.  The bulk of Plaintiff's relevant hearing testimony, and his arguments on appeal, relate to his seizures.  The Court therefore focuses its analysis on Plaintiff's seizure-related symptom reports.

[93] AR 72.

usually occur at night when he is asleep, with him awakening with no memory of the seizure but often with a "really horrible headache" and temporary light sensitivity.[94]  When this occurs, Plaintiff testified, he will rest in bed for a day or two until his head is starting to feel better.[95]

In addition to grand mal seizures, Plaintiff reported experiencing "mini seizures" at a frequency of "at least two to three times a week."[96]  Plaintiff described these mini seizures as starting with a "déjà vu feeling" and causing him to feel dizzy, light-headed, nauseated, and "like [he is] going to have a grand mal seizure."[97]  He further explained that the mini seizures typically make his mind "go blank," cause him to be confused about where he is, and substantially reduce his ability to focus.[98]  Plaintiff testified that he must immediately lie down for a few minutes to ensure that a mini seizure does not turn into a grand mal seizure; he also said he needs to "lay down and just relax" until he gets his memory and mind straight.[99]  He described these rest periods as lasting usually two or three hours

------

[94] AR 49–50.

[95] AR 50.

[96] AR 42, 46–48, 57.

[97] AR 47–48, 57.

[98] AR 46.

[99] AR 46, 54, 57.

1
2
but said the symptoms could sometimes repeatedly return for up to two or three days."[100]

3      ## 2.    The ALJ's Symptom-Report Analysis

4      The ALJ found Plaintiff's medically determinable impairments "could

5 reasonably be expected to cause the alleged symptoms" but that Plaintiff's

6 statements "concerning the intensity, persistence and limiting effects of these

7 symptoms are not entirely consistent with the medical evidence and other evidence

8 in the record."[101]  As to the seizure-related symptom reports, the ALJ explained as

9 follows:

10         [O]nce the claimant began treatment, he reported that he was doing
           well.  In 2019, treatment notes detail the initial seizure in April 2016
11         and one breakthrough seizure [in] November 2018.  Of note, the
           provider noted that there was medication non-compliance at that
12         time.  The claimant's grandmother reported that the claimant had
           brief seizures, which seem like déjà vu, and last for a minute and a
13         half.  She reported that the claimant has one to two episodes a month.
           Still, at a [April 2020] follow-up exam, the claimant denied having any
14         convulsive seizures and only a couple of déjà vu events.  At additional
           exams, no seizures were reported with consistent medication
15         compliance. . . . [T]he alleged frequency of seven seizures in 2020 and
           two-to-three mini seizures a week is not consistent with the reports in
16         the treatment records.  Further, [in June 2020,] the claimant's
           grandmother reported that he has only one seizure a month; however,
17         she noted that the claimant did not have any convulsive seizures in a
           [June 2019] log of activity.  He also had intact cranial nerve testing.[102]
18

19

20

21 [100] AR 42, 46–48

22 [101] AR 21.

23 [102] AR 21–22 (cleaned up, with dates inserted for context).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### 3.    The Applicable Standard and Lack of Evidence of Malingering

Absent affirmative evidence of malingering, to reject a claimant's symptom reports, the ALJ must provide "specific, clear and convincing" reasons supported by substantial evidence.[103]   Here, as mentioned, Dr. Barnard noted in his psychological examination of Plaintiff that there were "subtle indications" that Plaintiff had "attempted to portray himself in a somewhat negative manner."[104] But Dr. Barnard also said that this was "not to a degree that would invalidate the protocol," and he noted that Plaintiff's Test of Memory Malingering (TOMM) scores were normal.[105]   Perhaps more importantly, nothing in the ALJ's decision suggests that he discounted Plaintiff's symptom reports based on suspicions of over-reporting or malingering.[106]   Accordingly, the "specific, clear and convincing" standard applies.[107]

---

[103] *See* 20 C.F.R. § 416.929(c); SSR 16-3p, 2016 WL 1119029, at *7; *Ghanim*, 763 F.3d at 1163.

[104] AR 410.

[105] AR 410–11.

[106] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (review is constrained to the reasons asserted by the ALJ).

[107] *See* 20 C.F.R. § 416.929(c); SSR 16-3p, 2016 WL 1119029, at *7; *Ghanim*, 763 F.3d at 1163.

1

4.    <u>Lack of Meaningful Explanations</u>

2    Portions of the ALJ's analysis regarding Plaintiff's symptom reports lack

3    meaningful explanation.  For example, the ALJ did not explain how "intact cranial

4    nerve testing" might undermine any of Plaintiff's symptom testimony.[108]  And, as

5    to Plaintiff's mental-health symptoms, the ALJ cited to only one treatment note—

6    and offered no explanation as to whether it accurately represented the longitudinal

7    record—when stating, "A provider characterized the claimant's mental health

8    symptoms as mild to moderate in severity."[109]  The same is true for the ALJ's

9    statement that Plaintiff "reported feeling happy with better communication with

10    his relatives."[110]

11    On remand, if the ALJ intends to rely on these reasons for discounting

12    Plaintiff's symptom reports, the ALJ must more meaningfully explain how these

13    medical findings and notations provide a basis to discount Plaintiff's symptom

14    reports.

15

16    _____

17

18    [108] AR 22.  "Cranial nerves have motor, sensory and autonomic functions." Mahsa

18    Shahrokhi et al., *Neurologic Exam* (last updated Jan. 2022)

19    https://www.ncbi.nlm.nih.gov/books/NBK557589/.

20    [109] AR 23. *See Ghanim*, 763 F.3d at 1164 ("[T]he treatment records must be viewed

21    in light of the overall diagnostic record.").

22    [110] AR 23.

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

     5.   <u>Lack of Findings Regarding Seizure Symptoms and Frequency</u>

The ALJ relied upon prior treatment notes to reject Plaintiff's asserted seizure frequency of one grand mal seizure per month and mini seizures "at least two to three times a week." Even if such testimony is set aside, however, the treatment records consistently indicate that Plaintiff experiences, on average, at least one mini seizure per month.[111] Yet, the ALJ provided no findings regarding

---

[111] *See, e.g.*, AR 396 (March 2017: mini seizures "happening once a month or once a week per patient, though family states it is happening more frequently, several times weekly"); AR 408 (Sept. 2018: "reported that he last had a seizure in 2016); AR 787 (June 27, 2019: "Per log brought by grandmother, he has not had any convulsive seizures. However, he has had brief seizures which seems like a déjà vu feeling lasting about a minute to 1.5-minutes. Roughly 1–2 episodes a month." "Last breakthrough seizure on 11/24/18."); AR 845 (April 2020: "No convulsive seizures since last visit in June 2019. Reports déjà vu spells and possibly absence seizures 1–2 episodes a month."); AR 853–54 (June 2020: noting, "Grandmother reports he typically will have a seizure about once a month," but also noting, "last grand mal 1/2019 / déjà vu seizure July or Aug. 2019" (capitalizations altered)).

the true frequency of Plaintiff's seizures.  Nor did the ALJ address Plaintiff's mini-seizure symptoms or their impact—or lack thereof—on Plaintiff's RFC.[112]

ALJs are instructed to "consider all of the evidence in an individual's record" to "determine how symptoms limit ability to perform work-related activities."[113] The Court therefore instructs the ALJ on remand to make findings and provide explanations regarding the true frequencies of Plaintiff's grand mal seizures and mini seizures, as well as the symptoms associated with one of Plaintiff's typical seizure events.  If the ALJ again discounts Plaintiff's associated symptom reports, the ALJ shall provide clear and convincing reasoning supported by citations to substantial evidence.[114]  To the extent it would assist in the ALJ's analysis, the ALJ is encouraged to receive additional evidence on the topic of Plaintiff's seizures, including from one or more experts on the subject.

## V.    Conclusion

As set forth above, Plaintiff establishes that the ALJ consequentially erred. Although Plaintiff requests an immediate award of benefits, the evidence of record does not clearly establish that he is entitled to benefits; instead, "there are

---

[112] An ALJ must identify what symptoms are being discounted and what evidence undermines these symptoms. *See Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

[113] SSR 16-3p, 2016 WL 1119029, at *2.

[114] *See Ghanim*, 763 F.3d at 1163; *Lingenfelter*, 504 F.3d at 1036.

1    outstanding issues that must be resolved before a determination can be made[.]"[115]

2    Remand for further administrative proceedings is therefore necessary.

3        Accordingly, IT IS HEREBY ORDERED:

4        1.    Plaintiff's Motion for Summary Judgment, **ECF No. 17**, is

5        **GRANTED**.

6        2.    The Commissioner's Motion for Summary Judgment, **ECF No. 20**, is

7        **DENIED**.

8        3.    The Court **REVERSES** the decision of the ALJ and **REMANDS** this

9        matter to the Commissioner of Social Security for further proceedings

10        pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the

11        Commissioner is to instruct the ALJ as follows:

12        A.    Reexamine Dr. Reade's medical opinions.  If the ALJ again

13        finds Dr. Reade's medical opinions persuasive, the ALJ shall

14        specifically address the opinion limiting Plaintiff to tasks

15        involving only 1-to-2-step directions, explaining either how the

16        limitation was incorporated into the RFC or why it was

17        rejected.

18    //

19    /

---

20

21    [115] *See Leon v. Berryhill*, 800 F.3d 1041, 1045 (9th Cir. 2017); *Garrison*, 759 F.3d at

22    1020; *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 31

B.   Reexamine Plaintiff's reports regarding seizure symptoms and mental-health symptoms.  If the ALJ again discounts such symptom reports, the ALJ shall identify which statements are being rejected and provide clear and convincing reasoning—supported by citations to substantial evidence—for doing so.

C.   Provide express, specific analysis and findings regarding Plaintiff's grand mal seizures and mini seizures, specifically including for each type of seizure the average frequency, the associated symptoms, and how those symptoms were considered in assessing Plaintiff's RFC.

D.   Reassess Plaintiff's RFC and conduct steps four and five anew. The ALJ shall describe in detail how any new evidence and/or findings were considered in assessing Plaintiff's RFC.

E.   If helpful, conduct another hearing.  The Court finds it likely that additional evidence will be required to resolve the outstanding issues in this case.  Thus, the ALJ is encouraged to conduct such additional hearings and receive such additional evidence—including receiving additional testimony from a vocational expert and/or other experts—as are necessary to meaningfully address the issues identified above.

//

/

4.    The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

5.    The case shall be **CLOSED**.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

**DATED** this 8th day of September 2022.

_____
EDWARD F. SHEA
Senior United States District Judge

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 33